**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | :      **Case No. 24-cr-175 (TSC)** |
| **v.** | : |
| | : |
| **DANIEL HARRINGTON,** | : |
| | : |
| **Defendant.** | : |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Daniel Harrington to three months of incarceration on Count One, the midpoint of the Guidelines range, and 36 months of probation on Count Six. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### I.  Introduction

Harrington, 42, is a self-employed automobile mechanic who participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Harrington pleaded guilty to Count One of the Information, charging him with Theft of Government Property, in violation of 18 U.S.C. § 641, and Count Six of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). The government's recommendation is supported by the fact that Harrington (1) amplified the assault on the Capitol by helping other rioters scale an exterior wall to gain access to the Upper West Terrace of the building, (2) entered and re-entered rooms of the Speaker's office suite, where terrified staffers were sheltering in place to avoid the mob of violent rioters, some of whom were calling for the Speaker to show herself, (3) was inside the Capitol for a protracted period, 42 minutes, relative to many other rioters, (4) stole several items of personal property that belonged to the United States, apparently as souvenirs of his unlawful conduct, (5) refused to exit the building even though police officers repeatedly directed him to do so, and (6) has demonstrated an utter lack of remorse for his conduct on January 6.

The Court must also consider that Harrington's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Harrington's crime support a sentence of three months of incarceration and 36 months of probation in this case.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.    Factual and Procedural Background

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 17.

*Harrington's Role in the January 6, 2021, Attack on the Capitol*

Harrington traveled from Independence, Kentucky, to Washington, D.C., where he attended the "Stop the Steal" rally at the Ellipse. From the rally, Harrington walked down Constitution Avenue to the U.S. Capitol. He entered restricted Capitol grounds on the West Front.

Harrington climbed the Upper West Terrace stairs at approximately 2:12 p.m. While on the stairs, he stopped for about a minute and a half to assist other rioters who were scaling the wall. *See* Sentencing Exhibit 1.



*Image 1: Still image of Sentencing Ex. 1 at 2:12:53 p.m. Harrington on the Upper West Terrace stairs assisting other rioters who were scaling the wall.*

Harrington entered the Capitol building via the Senate Wing Door at approximately 2:16 p.m., only 3 minutes after it was initially breached. That means Harrington likely observed other rioters smash out the windows adjacent to the Senate Wing Door and heard the blaring alarm set off by the invasion.

3



*Image 2: Harrington entering the Capitol building via the Senate Wing Door.*

Harrington entered the Senators' Spouse's Lounge at 2:16 p.m.



*Image 3: Harrington inside the Senators' Spouse's Lounge.*

At approximately 2:27 p.m., Harrington entered the Rotunda, and was there for approximately a minute and a half. During that time, he took photos and video on his phone.



*Image 4: Harrington inside the Rotunda.*

Harrington exited the Rotunda at approximately 2:29 p.m. and walked down the hallway to the suite of offices of the Speaker of the House. At approximately 2:31 p.m., he stopped at a desk in the hallway, took a stapler and a tape dispenser from on top of the desk, and put them in his pockets. *See* Sentencing Exhibit 2 at 2:31:35 p.m. to 2:32:26 p.m.



*Image 5: Still image of Sentencing Ex. 2 at 2:31:45 p.m. Harrington taking a stapler (inside yellow box in Harrington's right hand) and tape dispenser (inside yellow box in Harrington's left hand) from a desk in the hallway of the Speaker's suite.*

5

A few seconds later, Harrington grabbed a pair of scissors that was on top of the desk and pocketed that as well. Harrington then opened a drawer in the desk and removed coasters. He threw one at a rioter coming down the hall toward him and took one. *See* Sentencing Exhibit 2 at 2:31:35 p.m. to 2:32:26 p.m.

At approximately 2:32 p.m., Harrington pointed up toward the doorframe, presumably at a sign indicating that this was the Speaker's suite and entered one of the rooms of the suite. He exited slightly more than four minutes later, at approximately 2:37 p.m.



*Image 6: Still image of Sentencing Ex. 2 at 2:32:26 p.m. Harrington pointing up to the doorframe of the Speaker's suite.*

When Harrington exited the Speaker's suite, police officers approached him at approximately 2:37 p.m., and pointed him in a direction away from the suite. *See* Sentencing Exhibit 2 at 2:37:41 p.m. to 2:38:27 p.m.



*Image 7: Still image of Sentencing Ex. 2 at 2:37:42 p.m. Police officers pointing Harrington in a direction away from the Speaker's suite.*

Harrington initially walked in the direction in which the officers were pointing, but returned a few seconds later, and re-entered a room in the Speaker's suite. During that time, the Speakers' staffers, terrified by the riotous mob attempting to break into their offices, sheltered in place inside those offices. *See* https://www.youtube.com/watch?v=fDLobzRYLQs.



*Image 8: Still image of Sentencing Ex. 2 at 2:38:19 p.m. Harrington a room in the Speaker's suite for the second time.*

Harrington exited the Speaker's suite a few seconds later and walked down the hall toward the Rotunda. At approximately 2:39 p.m., Harrington re-entered the Rotunda, and was there for

7

approximately three minutes. During that time, it appears that he asked another rioter to take a photo of him.



*Image 9: Harrington inside the Rotunda for the second time. Another rioter (yellow) appears to be taking a picture of Harrington.*

After exiting the Rotunda, Harrington entered Statuary Hall at approximately 2:42 p.m. After about two minutes, he turned around, and went back to the Rotunda.



*Image 10: Harrington inside Statuary Hall.*



*Image 11: Harrington inside the Rotunda for the third time.*

Harrington was inside the Rotunda this third time for less than one minute. At approximately 2:49:16 p.m., Harrington re-entered the Speaker's suite for the third time. *See* Sentencing Exhibit 3 at 2:49:14 p.m. to 2:49:20 p.m.



*Image 12: Still image of Sentencing Ex. 3 at 2:49:17 p.m. Capitol Harrington entering the Speaker's suite for the third time.*

Harrington was inside of the Speaker's suite this third time for approximately a minute and a half.

9



*Image 13: Harrington inside the Speaker's suite.*

Harrington exited the Speaker's suite at approximately 2:50 p.m. and re-entered the Rotunda, this time walking by a line of MPD officers.



*Image 14: Harrington entering the Rotunda for the fourth time.*

Harrington stayed in the Rotunda this fourth time for approximately six minutes, during which he sat on a bench and took photos with his phone.



*Image 15: Harrington inside the Rotunda for the fourth time.*

Harrington exited the Rotunda at approximately 2:57 p.m. He exited the Capitol building through the Rotunda Door at approximately 2:58 p.m.



*Image 16: Harrington exiting the Capitol.*

Harrington was inside of the Capitol building for approximately 42 minutes.

*Harrington's Pre-Sentencing Interview*

On May 2, 2024, the FBI interviewed Harrington, subject to the terms of his plea agreement. His attorney was present.

Harrington stated that he drove from Kentucky to Washington D.C. on January 5 with a friend to attend the Trump rally. He and his friend were separated at the rally. He walked to the Capitol after the rally speeches because he was following a stream of people.

Harrington stated that once he was inside the Capitol building, he saw police officers who were moving people through the door in an orderly fashion. Regarding his presence in the Speaker's suite, Harrington stated that he "wasn't really paying attention to where [he] was," but "at some point, somebody must have said" that it was the Speaker's office. He took the coasters from the desk because he thought it would be "cool" to have them. He stated that he sang the national anthem and God Bless America in the Rotunda.

Harrington described being inside the Capitol as a "very exciting, energetic moment." He was looking around and seeing things he had never seen before. He stated that he did not remember having a conversation with a police officer who told him to leave.

Once Harrington left the building, he found his friend outside, and they left Capitol grounds and went back to his vehicle. They then drove back to Kentucky.

Harrington stated that he threw the items that he had taken from the Speaker's suite in a dumpster on his way to his vehicle. He also stated that he deleted the photos and videos that he took while inside the Capitol years ago, and that they were not backed up in the cloud.

When asked about his thoughts regarding his conduct on January 6, Harrington stated that he did not hurt anyone or break anything. He went to D.C. because he heard that people in Black Lives Matter had threatened violence and murder against Trump and he was going to stand in the

middle. He stated that he wished he had not gone, because it has made things very difficult for him and his family.

<em>The Charges and Plea Agreement</em>

On April 10, 2024, the United States charged Harrington by a six-count Information with violating 18 U.S.C. § 641, 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(C), (D), and (G). On April 30, 2024, pursuant to a plea agreement, Harrington pleaded guilty to Count One, Theft of Government Property, in violation of 18 U.S.C. § 641, Count Six, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Harrington agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Harrington now faces a sentencing for violating Count One, 18 U.S.C. § 641, and Count Six, 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Harrington faces up to one year of imprisonment and a fine of up to $10,000 on Count One, and up to six months of imprisonment and a fine of up to $5,000 on Count 6. Harrington must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation for Count One, 18 U.S.C. § 641, set forth in the PSR.[2]

| U.S.S.G. § 2B1.1(a) | Base Offense Level | 6 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -2 |
| U.S.S.G. §§ 4C1.1(a)(1)-(10) | Chapter Four Adjustment | -2 |
| | **Total** | **2** |

While the government concedes that Section 4C1.1 applies to Harrington, the Court should vary upward by two levels to account for the reduction under § 4C1.1. An upward variance is warranted because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because the defendant's presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of government business or official functions"). Thus, Harrington's conduct caused a significant disruption to a vital governmental function, warranting

---

[2] As Count Six, 40 U.S.C. § 5104(e)(2)(G), is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications of criminal activity have gone mainstream.").

The U.S. Probation Office calculated Harrington's criminal history as Category I, which is not disputed. PSR at ¶ 62. Accordingly, the U.S. Probation Office calculated Harrington's total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶ 107. Notably, although Harrington has been convicted of both unlawful parading inside the Capitol building and stealing items of personal property from inside the building, his Guidelines range reflects only the theft conviction, because the parading offense is a Class B misdemeanor to which the Guidelines do not apply. But Harrington's thefts of the "souvenirs" while he was unlawfully inside the Capitol during a full-blown riot is significantly more aggravating than had those thefts occurred during, for instance, a permissible tour of the Capitol under normal conditions.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of three months of incarceration and 36 months of probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Harrington's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Harrington, the absence of violent or destructive acts is not a mitigating factor. Had Harrington engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Harrington's case is that he entered and re-entered rooms of the Speaker's suite—a highly sensitive location given the efforts of many rioters to locate

the Speaker on January 6 and the threats of numerous rioters to commit acts of violence against her—three times, even after being individually directed by the police to exit. This brazenness aggravates his already serious conduct. As Judge McFadden explained in the sentencing hearing in *United States v. Andrew Ericson*, 21-cr-506 (TNM), a case involving another rioter who was inside of the Speaker's suite:

> That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it.
>
> I do know there were staffers, you know, throughout the Capitol building. They were just terrified, huddling and sheltering in place, putting -- barricading themselves into offices, terrified that somebody would enter in and waiting there for hours before they were rescued and that you decided to enter into office space like [the prosecutor] said. I also saw you going through offices with computers. You know, it puts you in a different category than the other people I have sentenced who were only in areas that would normally be open for tours.
>
> I think your rummaging through a refrigerator and photographing yourself with your feet on the speaker's conference table also underlines just a wanton disrespect that you showed to the U.S. Capitol and our nation's leaders.

*United States v. Andrew Ericson*, 21-cr-506 (TNM), Sentencing Hearing Tr. at 21-22.

Additionally, Harrington lied to the FBI when he stated that he was not paying attention to where he was while he was inside the Speaker's office suite. He knew where he was because of the large sign on the doorframe and the items inside the suite. Harrington's attempts at minimization are self-serving and should weigh against him.

Another important factor in Harrington's case is that assisted rioters who were climbing up the wall to reach the Upper West Terrace, and thereby adding numbers to the crowd that had direct access to the building via the Senate Wing Door and Parliamentarian Door. Harrington's conduct here shows that he and his fellow rioters knew they were trespassing on Capitol grounds, because

no reasonable person could believe that it was permissible to access the Capitol building by scaling a wall.

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of incarceration in this matter.

### B. Harrington's History and Characteristics

Harrington has one prior criminal conviction from 2008 for driving while under the influence of alcohol or drugs in Ohio. He was sentenced to 180 days jail with 177 days suspended, and two years of community control.[3] This conviction does not count toward his criminal history calculation. It is undisputed that he falls in Criminal History Category I.

Harrington pleaded guilty quickly after having been arrested and arraigned. Nevertheless, for the reasons discussed below, Harrington's conduct demonstrates a need for specific deterrence in the form of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

---

[3] "Community control" is the term for probation in Ohio.

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Harrington has demonstrated an utter lack of remorse for his conduct on January 6. He has not acknowledged the seriousness of this conduct for the past three and one-half years. His biggest concern regarding his conduct is how it has affected him and his family. He has also attempted to justify his actions through convoluted reasoning that his presence was necessary at the Capitol to stave off violence from an anti-Trump group, when it was clear that was not the case.

Harrington does not grasp the momentous and destructive nature of his conduct, combined with the conduct of his fellow rioters. If he does not understand the seriousness of his actions, he will be primed to repeat them, should his preferred candidate not win in 2024. The Court must

sentence Harrington in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors to assault on police officers.[4] This Court must sentence Harrington based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

 Harrington has pleaded guilty to Count One, Theft of Government Property, in violation of 18 U.S.C. § 641, Count Six, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Count One is a Class A misdemeanor and Count Six is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, or more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

In *United States v. Virginia Spencer*, 21-cr-147 (CKK), the defendant pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). Like Harrington, Spencer was inside the Speaker's offices when staffers were hiding, and substantially minimized her conduct during an interview with the FBI. Judge Kollar-Kotelly sentenced the defendant to 3 months of incarceration, the same sentence the government recommends here.

In *United States v. Jason Riddle*, 21-cr-304 (DLF), the defendant pleaded guilty to violating 18 U.S.C. § 641 and 40 U.S.C. § 5104(e)(2)(G), the same offenses to which Harrington pleaded guilty. Like Harrington, Riddle photographed the chaos in and around the Capitol, treating it as a spectacle. Riddle also entered a sensitive space, the Senate Parliamentarian's Office, more than once, and stole items from it. Riddle gave interviews to the media where he expressed no

contrition. Judge Friedrich sentenced Riddle to 3 months of incarceration on the theft offense, and 3 years of probation on the petty misdemeanor.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced each of the defendants to 45 days of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Harrington must pay $500 in restitution, which reflects in part the role Harrington played in the riot on January 6.[6] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Harrington's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 140.

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VII.    Fine

Harrington's convictions subject him to a statutory maximum fine of $100,000 on Count One, for violation of 18 U.S.C. § 641, and $5,000 on Count Six, 40 U.S.C. § 5104(e)(2)(G). *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing Guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Harrington to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). Harrington's total net worth is approximately $1 million. PSR at ¶ 94. The U.S. Probation Office concludes that based on Harrington's financial profile, he appears to have the resources to pay a fine in addition to restitution. PSR at ¶ 104.

Pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The applicable Guidelines fine range is $200 to $9,500. U.S.S.G. § 5E1.2(c).

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Harrington to three months of incarceration and 36 months of probation. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Harrington's liberty as a consequence of his behavior, while recognizing the fact that he quickly pleaded guilty to his crimes.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:     */s/ Carolina Nevin*
CAROLINA NEVIN
Assistant United States Attorney
NY Bar No. 5226121
601 D Street, NW
Washington, DC 20530
(202) 803-1612
carolina.nevin@usdoj.gov