**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | 1:24-cr-00175-TSC |
| **v.** | **:** | |
| **DANIEL HARRINGTON** | **:** | |

## DEFENDANT'S SENTENCING MEMORANDUM

On January 6, 2021, Daniel Harrington walked into the United States Capitol. He entered through an open door. In the 42 minutes that he was inside, he did not break or damage any property; hurt, injure, accost, or threaten law enforcement (or anyone else); or proceed to the well of the House or the Senate. Mr. Harrington was not involved in planning or leading any of the activities that the crowd was engaged in on January 6, 2021, nor was he associated with any of the groups reported in the media to have been responsible for certain aspects of what occurred that day.

Mr. Harrington knows that, notwithstanding these facts, his mere participation and entry into the Capitol played a role in the events that transpired. He is a quiet man who has lived a life free from crime, and who has provided for his family. The images of what happened on January 6, 2021 will remain with him for the rest of his life, and his association with that day constitutes a permanent stain on his life, as his connection with the events at the Capitol has been edged in stone, with thousands of stories and articles on the Internet about his arrest. Mr. Harrington cannot change the past, but can only learn from it, and work to live a life going forward worthy of forgiveness. If he could do it all over again, he would not have entered the Capitol that day. Mr. Harrington is extremely remorseful for his own conduct, and for those injured and the damage that occurred that day.

1

Mr. Harrington's sincere remorse is not measured by his words, but rather confirmed by his actions following January 6, 2021, as he did *everything* that the criminal justice system could possibly hope and expect from someone who wants to accept full responsibility and atone for his actions.

Mr. Harrington cooperated with law enforcement from the outset, providing detailed information regarding his involvement on January 6, 2021, what they knew, what evidence they had, and what they saw. His cooperation began *before* he retained counsel, and *before* he had any knowledge of the charges against him. He was a quintessential voluntary cooperator from the start.

After he was charged, Mr. Harrington waived his right to a preliminary hearing, agreed to toll time under the Speedy Trial Act, and notified the Government that he would plead guilty immediately. When the Government indicated that Mr. Harrington could not receive a plea offer unless he cooperated with the Government — without the benefit of a debrief letter or a cooperation agreement (unheard of to his counsel who are both former prosecutors) — Mr. Harrington did so voluntarily and without hesitation. He agreed to meet with the FBI and U.S. Attorney, which aids in the prosecution of others.

The Government seeks a sentence of 3 months of incarceration, which is disproportionately excessive in this matter. Indeed, the Government seeks 3 months of incarceration even after hundreds of individuals who engaged in more serious activities and were convicted and sentenced for obstruction of an official proceeding are likely to have their felony convictions vacated by the United States Supreme Court and/or D.C. Circuit Court of Appeals have their sentences reduced to time served.

As discussed below, Mr. Harrington is a zero-point offender and his criminal history is

negligible.  He supports his partner and their minor children.  He is not involved in any radical militia groups or associated with any group responsible for the attack on the U.S. Capitol. He has limited social media presence (and no posts about the events of January 6). Since his arrest, Mr. Harrington has been in 100% compliance with his release conditions.

Mr. Harrington's conduct on January 6, 2021, where he never injured law enforcement officers or destroyed property, does not warrant 3 months of incarceration in this case, particularly when considered together with his cooperation with the Government from the earliest possible moment, his sincere acceptance of responsibility, and the lack of any serious criminal history.  In fact, the probation office's recommendation is for no incarceration.  As expressed by his partner and others in the letters submitted on his behalf, Mr. Harrington's contributions to others, acceptance of responsibility, and good deeds warrant leniency and an opportunity to prove to this Court, through a lengthy period of supervision, that he is someone who can atone for his actions and continue to be a beneficial person to his family and community.

In our country, we judge a man by *his* actions alone, not those of others; we evaluate one-day in a man's life, alongside all the other days in his life; we reward those who sincerely accept full responsibility for their actions; and we value actions taken to cooperate with the Government in its investigation and prosecution. These values support the recommended sentence below.

## I.    FACTUAL BACKGROUND

### 1.  Personal Life and Family History

Daniel Thomas Harrington was born on September 19, 1981 in Minneapolis, Minnesota to Kurt and Rita Harrington.  (Harrington, PSR, at ¶69).   His father passed away in 2023 from cirrhosis of the liver.  *Id.*  His mother, Rita, age 72, resides close by and is retired.  *Id.*

Mr. Harrington is a high school graduate from Forest Lake High School in Forest Lake,

Minnesota in 2000, who later attended some college part time at Northern Kentucky University from 2001 to 2006.  *Id.* at ¶¶ 84-85.  For the past 10 years, Mr. Harrington has been in a relationship with his partner, Robin Noonchester, with whom he has two children (ages 2 and 3), as well as a step son (age 11) who he helps to raise and support.  *Id.* at ¶¶ 72-73.

### 2. Work History

Mr. Harrington is self-employed, as the owner and operator of Harrington Performance, LLC, which purchases vehicles from auction and repairs them and then sells them.  PSR at ¶ 88. He has, over the past decade, held positions earning hourly wages at various employers and has demonstrated steady employment.  *Id.* at ¶¶ 89-93.

### 3. Acceptance of Responsibility

Mr. Harrington has cooperated with law enforcement.  Mr. Harrington, in a timely manner, agreed to plead to two misdemeanor offenses well in advance of any scheduled trial (indeed, no scheduling order was entered in this matter).  Since January 6, 2021, Mr. Harrington has regretted his actions on that day and has shown sincere acceptance of responsibility for those actions, which is memorialized in his letter to the Court (*see* letter by Daniel Harrington, attached hereto, A-001).

As reflected in the attached letter, Mr. Harrington accepts responsibility for his actions. He acknowledges that his actions have had and will continue to have a significant and lifelong impact on him and his family.  *Id.*  And he expresses deep regret.  *Id.*

His partner, Robin Noonchester, describes him as a "kind hearted, hard working, and honest man," who "stepped up to be the only father" her son (who is not Daniel's biological son) has ever known. (Letter Noonchester, A-002).  Equally, she describes Daniel as "a highly involved father, and a morally behaved human being."  *Id.*

His mother, Rita Harrington, recounts a history of putting others first, including saving a child's life as a lifeguard, pulling a driver out of a burning vehicle, performing CPR on a neighbor who was attacked, and more recently supporting his father during his terminal illness, and his mother, who is battling cancer.  *See* letter R. Harrington, A-003.

His sister, Kathy Quarles, likewise describes Daniel as someone who always is there for others, even when it is difficult for himself.  See letter, K. Quarles, A-004.

And others describe Mr. Harrington's willingness to assist and help others.  A-005-A007.

### 4.  The nature and circumstances of the charged offenses

As set forth in his statement of offense, Mr. Harrington paraded and demonstrated for approximately 42 minutes on January 6, 2021, entering at 2:16 p.m., and exiting at 2:58 p.m. (SOF, Doc. 17 at ¶¶ 11, 42-43).   Of note, he wore a "Trump" flag around his back, and entered the Senators' Spouse's Lounge, the Rotunda, an outside office in the Speaker's suite.  *Id.* at ¶¶ 29, 30, and 35.

Mr. Harrington approached a desk in a hallway, and took a pair of scissors, a tape dispenser, a stapler, and several paper coasters, which the government has described as "having some value."  *Id.* at ¶¶ 31-34.  We estimate that the total value of all of these items are under $5.00.[1]

---

[1] That estimation is based on a replacement cost value of a stapler at $1.75, https://www.officesupply.com/school-supplies/classroom-resources/classroom-supplies/staplers-accessories/business-source-half-strip-stapler/p1013504.html?ref=pla&utm_source=google&utm_medium=cpc&adpos=&scid=scplp1013504&sc_intid=1013504&gad_source=1&gclid=CjwKCAjw2dG1BhB4EiwA998cqDrHqYQ0f1Ac7l4VsWWHw_XGDk6lx9AnHYT9zjvCvJQpAs6RMdC15RoCGLcQAvD_BwE ; scissors at $0.56, https://www.officesupply.com/office-supplies/general-supplies/scissors-rulers-paper-trimmers/scissors/westcott-purpose-value-stainless-steel-scissors-bent-black/p788272.html?ref=pla&utm_source=google&utm_medium=cpc&adpos=&scid=scplp788272&sc_intid=788272&gad_source=1&gclid=CjwKCAjw2dG1BhB4EiwA998cqISNyI5I3-0UHo_sLcQOvm3_SNqobXmM7fLPjTXMPQ8CqNI6Mb4U3xoCQ0YQAvD_BwE ; a tape

The Government suggests that Mr. Harrington's actions were aggravated because he "amplified the assault on the Capitol by helping other rioters scale an exterior wall to gain access to the Upper West Terrace of the building," that characterization is over the top when the person(s) in question would have gotten through the crowd in all events, and all Mr. Harrington did was saw someone hanging onto a ledge, did not want them to fall or injure themselves, and so helped them up.  (Doc. 22 at page 2).  The Government equally argues that Mr. Harrington "entered and re-entered rooms of the Speaker's office suite, where terrified staffers were sheltering in place," but there is no evidence, at least that we have seen, that any staffers were present in the outer office that Mr. Harrington entered, or that Mr. Harrington interacted with any of them.  *Id.*  The Government equally argues that Mr. Harrington "refused to exit the building even though police officers repeatedly directed him to do so," yet there is no evidence of Mr. Harrington refusing to exit the building.  *Id.*  And, finally, the Government claims that Mr. Harrington somehow has an "utter lack of remorse," yet that is plainly not the case – both the

---

dispenser at $1.68, https://www.officesupply.com/office-supplies/general-supplies/tape-glue-adhesives/tape-dispensers/business-source-standard-desktop-tape-dispenser-core-skid-base-plastic-black-each/p72303.html?ref=pla&utm_source=google&utm_medium=cpc&adpos=&scid=scplp72303&sc_intid=72303&gad_source=1&gclid=CjwKCAjw2dG1BhB4EiwA998cqFavFhHzFCCyysN7BPGFuYB2JzPw0zgwqkTq8xVu5tQlt-RMbGtuPRoCVMoQAvD_BwE and coasters at $0.17 per coaster, x 3 coasters, for a value of $0.51, https://www.amazon.com/Plain-White-Coasters-Inches-Round/dp/B079566ZN5/ref=sr_1_7?dib=eyJ2IjoiMSJ9.siAKVfyqlsQi-Wn58_PVFfntiQ4kpzI_lc20G0h0dIqcfyM0Bg1Fhie58qB_347ZCqLJMhodpVRnEjooTNim0F7TNYItCkr885iU5QmdTThy0DVQc_9r235cHdoqlPin7kYpkuDzZ0UrDL7MKT_Y-ENVQOCXrGUcXghlHC1-HWWXW76QVdnHiULshREPPDEIPYHxDshmlhyetIgqpiENEMYDd83SZ-WJyMVMGOtTnPRWepNGxMsmztb3vXkDVVYcwy1EcFZnnZEXVTeKK4kGsrnn-nK8NH98pXCp6a6t5Tk.rY2ZlqI25l3FNIo-j3OeG__nUtwZH5oryb_Ne2HB7MU&dib_tag=se&gad_source=1&hvadid=694867017996&hvdev=c&hvexpln=67&hvlocphy=1017733&hvnetw=g&hvocijid=7003750622963267244--&hvqmt=e&hvrand=7003750622963267244&hvtargid=kwd-300476354399&hydadcr=24634_13611738&keywords=paper+drink+coasters&qid=1723151454&sr=8-7 .

PSI, and Mr. Harrington's statement (A-001), along with his acceptance of responsibility and guilty plea all demonstrate both remorse and acceptance of responsibility.

The Government suggests that Mr. Harrington somehow "minimized" his culpability when he truthfully told the FBI that he did not initially realize he was in the Speaker's offices, because there was a sign to that office. All Mr. Harrington told the FBI was that he was not initially aware that the offices were the Speaker's offices, but he came to realize it later. The Government does not, however, point to video showing Mr. Harrington looking up at the sign (there is no such video), or any other objective evidence that would show that Mr. Harrington, in a chaotic situation, took the time to look around. And Mr. Harrington's admission that he eventually realized it was the Speaker's office undermines the "gotcha" moment that the Government claims.

## II.   ARGUMENT

### A.  The Sentencing Guidelines, Statutory Factors, and Other Considerations Support a Sentence Below the Guidelines.

Mr. Harrington faces sentencing on two misdemeanor charges, 18 USC § 641 (theft of government property under $1,000) and 40 USC § 5104(e)(2)(G) (parading, demonstrating, and picketing on Capitol grounds). Neither charges requires this Court to impose a term of incarceration. Rather, the sentencing factors of 18 U.S.C. § 3553 require this Court to formulate a sentence which is sufficient to accomplish the purposes of sentencing (as addressed below). Accordingly, so long as this Court determines Mr. Harrington's sentence is sufficient as to him, it is appropriate for purposes of 18 U.S.C. § 3553(a) and takes its appropriate place in the grand scheme of the criminal justice system.

#### 1.   Sentencing Discretion and Section 3553 Statutory Factors.

The Guidelines are only advisory despite their mandatory language. *See United States v. Booker*, 543 U.S. 220, 245 (2005). A district court must therefore "consider Guidelines ranges," but is permitted "to tailor the sentence in light of other statutory concerns as well." *Id.* The Supreme Court in *Gall v. United States,* 552 U.S. 38, 49-50 (2007) outlined the process to follow:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, *after giving both parties an opportunity to argue for whatever sentence they deem appropriate*, the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, *he may not presume that the Guidelines range is reasonable*. He must make an individualized assessment based on the facts presented.

*Id.* (emphasis added) (citations and punctuation omitted).

Thus, in fashioning an appropriate sentence, this Court must consider the Guidelines along with the other factors set forth in 18 U.S.C. § 3553(a) (*see Booker*, 543 U.S. at 260; U.S. Sentencing Comm'n, Guidelines Manual (Nov. 2023) (hereinafter, "USSG")), and treat the Guidelines "as one factor among several" that § 3553(a) requires courts to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

Pursuant to 18 U.S.C § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence." Further, under 18 U.S.C. § 3582, the court, in considering the factors in § 3553(a) and their applicability, should recognize "that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a) (emphasis added).

Although the guidelines range will generally align with the objectives of the § 3553(a) factors, that is not always the case. As the Supreme Court said in *Kimbrough*:

> [I]n the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives. *The sentencing judge, on the other hand, has greater familiarity with the individual case and the individual defendant before him than the Commission or the appeals court. He is therefore in a superior position to find facts and judge their import under § 3553(a) in each particular case.* In light of these discrete institutional strengths, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply.

552 U.S. at 109 (emphasis added) (citations and punctuation omitted).

As one district court has framed it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula." *See* Terry Carter, Rakoff's Stance on the SEC Draws Fire, Praise—and Change: The Judge Who Said No, ABA Journal, Oct. 2013, at 53.

### 2. Applicable Sentencing Guidelines Range.

According to the Presentence Report writer, through application of USSG §2B1.1, the base offense level is six, and a two point adjustment for cooperation under §3E1.1(a), for an offense level of 4. (PSI ¶ 110). Moreover, the PSI writer appropriately recognized that Mr. Harrington is a zero point offender, entitled to receive an adjustment under USSG §4C1.1, taking his total offense level to 2. (PSI ¶ 109-110). His base guidelines factor is zero to six months. *Id.* at ¶ 107. But because he falls in "Zone A" of the guidelines, and as the PSI writer confirms, "a sentence of imprisonment is not required." *Id.* at ¶ 107. Moreover, in light of the zero-point offender adjustment under USSG §4C1.1, "a sentence other than a sentence of imprisonment, in accordance with USSG §5C1.1(b) or (c)(3) is generally appropriate. USSG §5C1.1, comment. (n.10)." *Id.* at ¶ 109.

Moreover, "[s]ince the applicable guideline range is in Zone A of the Sentencing Table, a condition requiring a period of community confinement, home detention, or intermittent confinement may be imposed, but is not required. USSG §5B1.1, comment. n.1(a)." *Id.* at ¶ 129.

### 3.   A Bottom of the Guidelines Sentence Is Appropriate in This Case.

District courts may impose a sentence below the Guidelines range through either a "departure" or "variance." *See United States v. McKinnie*, 21 F.4th 283, 289 (4th Cir. 2021). A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently "triggered by a prosecution request to reward cooperation . . . or by other factors that take the case 'outside the heartland' contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense." *United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) (citation and punctuation omitted). "A 'variance,' by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a)." *Id.* (citation omitted); see also USSG § 1B1.1(c).

Pursuant to 18 U.S.C. § 3553 (and specifically those portions of it that are applicable to this sentence), factors this Court is to consider in imposing the sentence, which should be sufficient, but not greater than necessary, to comply with the purposes of sentencing are:

(1)      the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)      the need for the sentence imposed —
(A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)      to afford adequate deterrence to criminal conduct;
(C)      to protect the public from further crimes of the defendant; and
(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)      the kinds of sentences available;
(4)      the kinds of sentence and the sentencing range established for—

(A)      the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

…

(6)      the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)      the need to provide restitution to any victims of the offense.

Here, Mr. Harrington should receive a bottom of the Guidelines sentence, as the applicable § 3553(a) sentencing factors support a non-custodial sentence in this case.  Indeed, the probation officer in this case recommends no incarceration.

### a.  The Nature and Circumstances of the Offense.

In various sentencing memoranda concerning January 6, 2021, the Government has recognized that not all actors are equal in terms of culpability. The Government also has systemically been setting forth factors for judges to consider in relation to January 6, 2021 sentences,[2] including: (i) whether, when, and how the defendant entered the Capitol building; (ii) whether the defendant engaged in any violence or incited violence; (iii) whether the defendant engaged in any acts of destruction; (iv) the defendant's reaction to acts of violence or destruction; (v) whether during or after the riot, the defendant destroyed evidence; (vi) the length of the defendant's time inside of the building, and exactly where the defendant traveled;[3] (vii) the defendant's statements in person or on social media; (viii) whether the defendant cooperated with, or ignored, law enforcement; and (ix) whether the defendant otherwise exhibited evidence of remorse or contrition.[4] We submit that one additional factor should also be considered: (x) whether the defendant was involved with planning or coercing the events of January 6, 2021.[5]

---

[2] *See United States v. Reeder*, No. 21-cr-166, Gov't Sent. Mem. at 6-7 (D.E. 26).

[3] *See United States v. Morgan*, No. 21-cr-00164, Gov't Sent. Mem. at 6 (D.E. 22) (identifying location in the Capitol as a relevant factor and questioning whether the defendant entered specific areas).

[4] *See, e.g.*, *United States v. Morgan*, No. 21-cr-164, Gov't Sent. Mem. at 6 (D.E. 22).

[5] *See, e.g.*, *United States v. Morgan*, No. 21-cr-164, Gov't Sent. Mem. at 6 (D.E. 22).

Defendant Daniel Harrington entered the through the 1st Floor Senate Wing Door, and did not force entry. This factor weighs in favor of the Defendant.[6] Mr. Harrington neither engaged in, nor incited violence, nor did he encourage, promote, or otherwise tolerate any violence, which shows both the third and fourth factors also weigh in his favor. Mr. Harrington did not destroy any evidence, and, in fact, fully cooperated with the Government law enforcement and offered to provide all evidence in his possession upon his first contact with the FBI, even though he was under no legal obligation to do so. Again, this fifth factor weighs strongly in his favor. Mr. Harrington was in the Capitol a limited period of time, though he did enter an outer office of the Speaker, which is an aggravator.[7]

The Defendant here made no statements on social media, and none to or in traditional media, also weighing in his favor.

In terms of cooperation with law enforcement, separate discussion is warranted. Mr. Harrington's activities here, including early, full, and free disclosure to the FBI, continued cooperation with the FBI throughout this case, an FBI debrief, permitting the FBI to search his electronic devices after he was charged, which presumably will aid in the prosecution of others, is nothing short of remarkable cooperation. If, as the Government has conceded in other January 6, 2021 cases, there is a spectrum of conduct and culpability in the events of January 6, 2021, there is also a spectrum of conduct in terms of cooperation that followed.

The January 6, 2021 investigation continues, but a cogent consideration for *this* Court, in *this* sentence, is whether or not it should encourage the sort of cooperation that Mr. Harrington

---

[6] *See*, *e.g.*, *United States v. Bustle*, 1:21-cr-238, Government Sentencing Memoranda, at D.E. 38.

[7] *See United States v. Morgan*, 1:21-cr-00164 at D.E. 22, p. 6 (Government discussion of the factor at issue and questioning whether the Defendant entered these areas).

exhibited, by giving due and full consideration to it in the formulation of a sentence?  We submit that to fail to give significant weight to his cooperation is to tell the world (and the hundreds of other Defendants) that there is no benefit to significant cooperation.  And, with respect, given the breadth and scope of the investigation, government resources involved in that investigation, and the sheer expense if hundreds of other misdemeanor Defendants decide that they may as well go to trial, clogging up limited Court resources, the Court should send the exact opposite message. This factor, for this Defendant, is entitled to significant weight in the formulation of any sentence, and the Government, for its part, admits as much.

Mr. Harrington was not involved with planning or coercing the events of January 6, 2021. But, as to the final factor the Court should consider that Mr. Harrington repeatedly, from the outset, through his attorneys, expressed a desire to plead guilty, expressed significant remorse, acknowledge his conduct, and promptly resolve his case.  The Government has elsewhere, in another January 6, 2021 case, acknowledged that this is entitled to "significant weight."[8]  It is entitled to significant weight here as well.

### b.  Defendant's History and Characteristics, Nature of the Offense.

Mr. Harrington is by all accounts, a hard-working, dedicated, and kind-hearted partner, father, and small business owner, with a family who loves and supports him. *See* Letters, attached hereto.

Mr. Harrington is not a violent person and poses no danger to society, as evidenced by the Government's willingness to let him live in the community for the past year, self-surrender when initially charged, and remain released on his personal recognizance. He is a zero point offender.  Moreover, as discussed extensively above, Mr. Harrington immediately took

---

[8] *United States v. Bustle*, 1:21-cr-238, Government Sentencing Memoranda, at D.E. 38 at p. 6.

responsibility for his conduct and cooperated with law enforcement.

> ### c. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

The events of January 6, 2021 were both serious and tragic, yet, as reflected above, not every actor that day has equal culpability. Is it appropriate to treat Mr. Harrington the same as those who set out to injure law enforcement (or did so), or those who organized and incited others to act, or even worse, those who injured law enforcement?  To ask these questions is to answer them. The appropriate consideration under this statutory factor is not whether the events of January 6, 2021 were serious (because there is no dispute that they were). Instead, the appropriate consideration is to weigh and judge each defendant's activities and involvement in the events of that day separately. We submit that consideration of Mr. Harrington's conduct relative to the factors set forth above, and articulated by the Government in other sentencing memoranda related to January 6, 2021 cases, supports leniency in sentencing.

Over 1,300 individuals have been charged in connection with the events of January 6, 2021, some with felonies and some with misdemeanors. Each of these cases involves a wide range of conduct, committed before, during, and after January 6, 2021, by each particular defendant. Each of these cases should be judged based on the defendant's individual conduct and not the conduct of others. Given these factors and for the reasons discussed above, a non-custodial sentence is appropriate here.

> ### d. Adequate Deterrence (Specific and General).

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. See 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C.

Cir. 2010). Specific deterrence is obtained for the defendant by the prosecution and conviction itself. The personal and reputational consequences Mr. Harrington has suffered are more than sufficient to discourage him from engaging in similar conduct. Mr. Harrington has also grown significantly since this offense, and recognizes the importance of continuing to improve, both for himself and for his life partner, his family, and his community.

As for general deterrence, several observations can be made. First, the prosecution itself (and the publicity of conviction) all serve as a significant general deterrence. *See, e.g., Wayte v. United States*, 470 U.S. 598, 607 (1985) (observing that any prosecution has a "general deterrence value"); *United States v. Gamarra*, 940 F.3d 1315, 1321 (D.C. Cir. 2019) (observing that prosecution itself provides general deterrence). If that is true generally, it is especially true here.

The charges in this case received press coverage.[9] There is every indication that the public condemnation of Mr. Harrington will continue for the foreseeable future. Unlike various other federal charges (besides other defendants in January 6 cases), no one would want to expose themselves to the level of vitriol that is being attributed to January 6 defendants — regardless of the level of their participation or the severity of their particular charges.  The point of this observation is that the publicity involved in these cases itself provides significant general deterrence, unlike any run of the mill federal case. When whatever sentence this Court imposes is completed, the headlines will remain. January 6, 2021 will be a day that lives in infamy, and, for those who were charged in connection with the events at the Capitol, it will be a lifelong blemish on their record.

---

[9] https://www.wdrb.com/news/crime-reports/doj-releases-details-of-covington-kentucky-mans-role-during-jan-6-capitol-riot/article_4d6aae68-dcf0-11ee-9c2e-8b0f85fb8704.html (last accessed 8/8/2024);

Furthermore, while the events of January 6, 2021 were unacceptable by any measure, and must be deterred from ever occurring again, it would be inappropriate to treat every participant in that event equally, without regard to the circumstances of their involvement, and without regard to the cooperation and acceptance of responsibility they exhibited afterwards.

### e.  Kinds of Sentences Available.

A sentence of incarceration is not always necessary in order to satisfy the sentencing mandate. Indeed, in holding that a sentence of probation was reasonable, the Supreme Court in *Gall v. United States*, cited to the district court's memorandum, which noted that probation (or post-release supervision), "rather than an act of leniency, is a substantial restriction of freedom." 552 U.S. 38, 44 (2007) (punctuation omitted). The district court also emphasized that the defendant would have to "comply with strict reporting conditions," and would "not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court." *Id.*

This Court may also consider a sentence with a period of home detention, which has been defined by the Guidelines as:

> [A] program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, education or training programs, and such other times as may be specifically authorized. Electronic monitoring is an appropriate means of surveillance and ordinarily should be used in connection with home detention. However, alternative means of surveillance may be used so long as they are as effective as electronic monitoring.

USSG § 5F1.2, Commentary, n.1.

Based upon the information contained in this submission, and given the mandate of 18 U.S.C. § 3553(a)(3) for the Court to consider "the kinds of sentences available," a community

service order would also satisfy the goals of sentencing.  A 2001 publication of the Administrative Office of the United States Courts described community service as "a flexible, personalized, and humane sanction," and "offers a way for the offender to repay or restore the community." Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service, Office of Probation and Pretrial Services, Administrative Office of the U.S. Court (Feb. 2001). It is "practical, cost-effective, and fair — a 'win-win' proposition for everyone involved." *Id.* It is also recognized that "[c]ommunity service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation. . . . It restricts offenders' personal liberty[,] . . . allows offenders to atone or 'make the victim whole' in a constructive way[, and] . . . may be regarded as . . . a form of symbolic restitution when the community is the victim." *Id.*

In selecting an appropriate candidate to perform community service, United States Probation recommends as follows:

> Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service. . . . Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence.  *Id.*

As discussed below, and in recognition that this sentencing Court has imposed incarceration in every January 6 case, in light of the fact that both the sentencing guidelines Zero Point offender guidance, and the probation office urge the Court to not impose incarceration, Mr. Harrington submits that an appropriate sentence in this case is 10 days of incarceration, a fine of $500, restitution of $500 to the architect of the Capitol as the parties agreed to, restitution of $10 to Congress for the value of the items in question, one year of probation, and a $35 special assessment.

**B.  The Need to Avoid Unwarranted Sentencing Disparities.**

The undersigned undertook to analyze comparator cases, both from this sentencing Court, and involving similar charges.

Two observations prior to conducting the comparator analysis.  First, the facts and circumstances of each case matter, and so, as we conduct the comparison here, in addition to looking at the charge and offense, we also analyze the conduct of Mr. Harrington and other salient facts in comparison to the comparator case, both the mitigating and aggravating.  And second, we have generally excluded, as comparators, those cases that include not only the charges at issue here, but also include other more serious charges.  We also excluded cases where the underlying facts were clearly distinguishable.

As for Mr. Harrington's request for the sentence at issue, it is worth noting that numerous January 6 Defendants have not been sentenced to incarceration. Below are the names (71 in total) of every January 6, 2021 Capitol breach defendant for whose conduct the Government did not even seek a sentence of incarceration:[10]

| | | |
|---|---|---|
| Morgan-Lloyd, Anna | Ehrke, Valerie | Bissey, Donna |
| Hiles, Jacob | Wangler, Douglas | Harrison, Bruce |
| Bustle, Jessica | Doyle, Danielle | Bennett, Andrew |
| Mazzocco, Matthew | Rosa, Eliel | Gallagher, Thomas |
| Vinson, Thomas | Dillon, Brittiany | Sanders, Jonathan |
| Fitchett, Cindy | Sweet, Douglas | Cordon, Sean |
| Wilkerson, John | Jones, Caleb | Brown, Terry |
| Wrigley, Andrew | Parks, Jennifer | Reimler, Nicholas |
| Miller, Brandon | Miller, Stephanie | Hatley, Andrew |
| Pert, Rachael | Winn, Dana | Wickersham, Gary |
| Schwemmer, Esther | Kelly, Kenneth | Straka, Brandon |
| Sizer, Julia | Blauser, William | Barnard, Richard |
| Witcher, Jeffrey | McAlanis, Edward | Lollis, James |
| Schubert, Amy | Schubert, John | Orangias, Michael |
| Quick, Michael | Reda, Kenneth | McCreary, Brian |
| Colbath, Paul | Lewis, Jacob | Lentz, Nicholes |
| Daughtry, Michael | Juran, John | Genco, Raechel |
| Macrae, Douglas | Seymour, Paul | Ferguson, Jamie |

---

[10] See Government's Sentencing Table of January 6 Capitol Defendants, dated February 12, 2024. https://www.justice.gov/usao-dc/media/1331746/dl?inline

| | | |
|---|---|---|
| Fontanez-Rodriguez, Samuel | Bostic, Karegan | Bostic, Willard Jr. |
| McFadden, Tyrone | Mileur, Aaron | Williams, Carrie |
| Rutledge, Meghan | Saer, Lilith | Cantrell, Eric |
| Smith, Gary | Kuecken, Deborah | Traugh, Christina |
| Culbertson, Alan Scott | Harrison, Jeremy | Ramakrishn, Karthik |
| Connolly, Kim Marie | Pacheco, Angelo | |

The above list does not even include all the January 6 Capitol breach defendants for whom the

Government sought a sentence of incarceration at sentencing, but judges in this District refused

to impose a period of incarceration (172 in total):

| | | | |
|---|---|---|---|
| Cordon, Kevin | Abual-Ragheb, Rasha | Nelson, Brandon | Markofski, Abram |
| Marquez, Felipe | Mariotto, Anthony | Edwards, Gary | Tutrow, Israel |
| Kostolsky, Jackson | Rusyn, Michael | Sells, Tanner | Walden, Jon |
| Prado, Nicole | Williams, Vic | Wiedrich, Jacob | Stepakoff, Michael |
| Wilson, Zachary | Wilson, Kelsey | McAuliffe, Justin | Williams, Andrew |
| Leffingwell, Mark | Sunstrum, Traci | Gonzalez, Eduardo | Strong, Kevin |
| Nalley, Verden | Carico, Michael | Loftus, Kevin | Kelley, Kari |
| Martin, Zachary | Cudd, Jenny | Jackson, Micajah | Ivey, Bryan |
| Burress, Gabriel | Pettit, Madison | Fee, Thomas | Zlab, Joseph |
| Fox, Samuel | Hardin, Michael | O'Malley, Timothy | Rebegila, Mark |
| Conover, Thomas | Krzywicki, Carla | Kulas, Christian | Kulas, Mark |
| Von Bernewitz, Eric | Ballesteros, Robert | Peart, Willard | Spain, Jr., Edward |
| Chapman, Robert | Tagaris, Jody | Sywak, William Jason | Sywak, William Michael |
| Laurens, Jonathan | Cunningham, Christopher | Torre, Benjamin | Suarez, Marissa |
| Todisco, Patricia | Persick, Kerry | Buckler, Matthew | Cavanaugh, Andrew |
| Ortiz, Christopher | Homer, Lisa | Fracker, Jacob | Vollan, Cody |
| Thurlow, Steven | McNicoll, Lois Lynn | Youngers, Darrell | Carollo, Anthoy |
| Bratjan, Frank | Ferreira, Leticia | Connor, Francis | Ferrigno, Antonio |
| Lunyk, Anton | Vincent, Reva | Ayres, Stephen | Hentschel, Cara |
| Munn, Dawn | Munn, Joshua | Munn, Kayli | Munn, Kristi |
| Munn, Thomas | Munger, Jeffrey | Rodean, Nicholas | Mels, James Allen |
| Clark, Christy | Clark, Matthew | Spigelmyer, Paul | Uptmore, James |
| Brooks, James | Yazdani-Isfehani, Abigail | Yazdani-Isfehani, Loruhamah | Comeau, Jason |
| Evans III, Treniss | Castle, Trudy | DiFrancesco, Kimberly | Wood, Matthew |
| Wiersma, David | Frankowski, Dawn | Buxton, Jonas | Billingsley, Steven |
| Gross, Juliano | Council, Matthew | Johnson Jr, Thaddis | Bond, Stacy Lee |
| Conlon, Paula | Witzemann, Shawn | Slaeker, Tyler | Montalvo, Matthew |
| Gable, Levi | Faulkner, Luke | Javid, Iraj | Lanham, Melanie |
| Gleffe, Marcos | Heathcote, Chad | Manwaring, Susan | Bustos, Alexis |
| Bustos, Bryan | Myers, Rachel | Grover, Logan | Cramer, Country |
| Gordon, Vaughn | Gerwatowski, Eric | Ambrose, Lawrence | Tilley, Todd |
| Montoya, Samuel | Weibling, Adam | Cronin, Kevin | Massie, Kenneth |
| Hallon, Luis | Gould, John David | Jones, Brian Raymond | King, Patrick John |
| Horvath, Ian | Gerding, Christina | Gerding, Jason | Bokoski, Bradley |
| Bokoski, Matthew | Chiguer, Stefanie | Cohen, Menachem | Temple, Cole Andrew |
| Smith, Justin Michael | Greene, Michael | Hart, Timothy Allen | Gallman, Joei |
| Gallman, William | Isaacs, William | Parker, Sandra | Parker, Bennie |
| Machacek, Brennen | Schulz, Kenneth | Etter, Jeffrey | Hellonen, Dodge |
| Llamas, Saul | Messer, Walter | Siemers, Jordan | Coomer, Micah |
| Abate, Joshua | Preller, Brian | Yavoich, Andrew | Dodge, Russell |

| Krauss, David | Krauss, Nicholas | Ardolino, Vincent | Cotton, William |
|---|---|---|---|
| Weyer, Conlin | Chang, Julio C | Torrens, Eric | Gruppo, Leonard |
| Vinson, Lori | Griffith, Jack | Ryan, Jennifer | Stotts, Jordan |

Comparator cases for a charge of a misdemeanor that includes misdemeanor theft of government property (18 USC § 641 (theft of government property under $1,000)) conviction, sometimes with other misdemeanor charges, include the following:[11]

| Defendant and case | Charge(s) | Govt. Recommended Sentence | Sentence Imposed |
|---|---|---|---|
| Petrosh, Robert, 1:21-CR-00347-TNM | 18 USC 641 | 4 months' incarceration 12 months' supervised release 60 hours community service $938 restitution | 10 days' incarceration 12 months' supervised release $1,000 fine $938 restitution |
| Riddle, Jason, 1:21-CR-00304-DLF | 18 U.S.C. 641 40 U.S.C. 5104(e)(2)(G) | 3 months' incarceration 12 months' supervised release $754 restitution | 3 months' incarceration 36 months' probation $754 restitution 60 hours' community service |
| Merry, William, 1:21-CR-00748-JEB | 18 U.S.C. 641 | 4 months' incarceration 12 months' supervised release $500 restitution 60 hours' community service | 45 days' incarceration 9 months' supervised release 80 hours' community service |
| Lyon, Robert, 1:21-CR-00161-RBW | 18 U.S.C. 1752(a)(2) 18 U.S.C. 641 | 3 months' incarceration 12 months' supervised release $2,000 restitution | 40 days' incarceration 12 months' supervised release $1,000 fine $2,000 restitution |
| Suleski, Ryan, 1:21-CR-00376-RDM | 18 U.S.C. 1752(a)(1) 18: U.S.C 641 | 3 months' incarceration 12 months' supervised release 60 hours' community service $500 restitution | 60 days' incarceration 60 hours' community service $500 restitution |
| Varney, Shelly, 1:22-CR-00372-JDB | 18 U.S.C. 641 18 U.S.C. 1752(a)(1) | 50 days' incarceration 12 months' supervised release $500 restitution | 24 days' incarceration 12 months' supervised release $1,000 fine $500 restitution |
| Maimone, Debra, 1:21-CR-00289-RDM | 18 U.S.C. 641 18 U.S.C. 1752(a)(1) 18 U.S.C. 1752(a)(2) 40 U.S.C. 5104(e)(2)(D) 40 U.S.C. 5104(e)(2)(G) | 3 months' incarceration 12 months' supervised release 60 hours' community service $1,806 restitution | 24 months' supervised release 120 days of home detention $1,806 restitution |
| Vogel, Philip, | 18 U.S.C. 641 | 5 months' incarceration | 30 days' incarceration |

---

[11] Available at: https://www.justice.gov/usao-dc/media/1331746/dl?inline (last accessed 8/8/2024).

| 1:21-CR-00289-RDM | 18 U.S.C. 1752(a)(1) 18 U.S.C. 1752(a)(2) 40 U.S.C. 5104(e)(2)(D) 40 U.S.C. 5104(e)(2)(G) | 12 months' supervised release 60 hours' community service $1,806 restitution | 24 months' supervised release $1,806 restitution |
|---|---|---|---|
| Amsini, Daniel, 1:23-CR-00423-CJN | 18 U.S.C. § 641 | 3 months' incarceration 12 months' supervised release 60 hours' community service $749 restitution | 45 days' incarceration 12 months' supervised release 60 hours' community service $749 restitution |
| Wilson, Gary, 1:21-CR-00046-RDM | 18 U.S.C. § 641 | 3 months' incarceration $500 restitution | 30 days' incarceration 12 months' supervised release $500 restitution |

In most of the comparator cases above, there were significant additional aggravating factors and underlying facts simply not present in Mr. Harrington's matter.

Start with *United States v. Riddle*, 1:21-CR-00304-DLF (a case the Government uses as a comparator) where the Defendant stole a bottle of wine, a valuable Senate Parliamentarian book, gave multiple live interviews afterwards on television news bragging about how proud he was of what he did, and was involved in the actual ransacking of the Senate parliamentarian's office, all make his offense more egregious than that of Mr. Harrington. (See Govt. Sentencing Memo, Case No. 1:21-CR-00304-DLF at Doc. 31). As the Government described it, "Jason Riddle's conduct was more serious than some of the cases discussed above. His thefts, involvement in the Capitol riot, his malicious celebration and attempt to exert control over the Parliamentarian's Office, his unremorseful statements, particularly when they were made to large television audiences, and his attempt to benefit from his actions in the riot and this case puts him in a more serious category of misdemeanants and warrants a sentence of incarceration." *Id.* at p.27. He was sentenced to 3 months' incarceration, 36 months' probation, $754 restitution, and 60 hours' community service.

Next, *United States v. Suleski*, 1:21-CR-00376-RDM, where the Defendant did not merely parade and demonstrate and engage in the theft of property, but then bragged about it on

international news to reporters, speaking of participating in revolutionary activity, and then lied to the FBI about his involvement, lied to probation about military misconduct and discharge, and expressed no remorse.  (See Govt. Sentencing Memo, Case No. 1:21-CR-00304-DLF at Doc. 31). The Defendant's history also included a Bad Conduct Discharge from the military.  *Id.*  Suleski's social media suggested a penchant for violence when he posted a video of an assault rifle and a racially charged statement indicating his willingness to use it against minorities.  *Id.* at p.26-27. Suleski involved a higher guideline number (2 points higher without the zero-point offender adjustment, 4 points higher with the adjustment).  He was sentenced to 60 days' incarceration, 60 hours' community service, and $500 restitution.

In *United States v. Merry*, 1:21-CR-00748-JEB, the Defendant (i) stormed past law enforcement officers shouting "we're going in;" (ii) took a part of the Speaker's office sign and then displayed it in triumph; (iii) appeared in an interview proudly claiming he was a "hero…tak[ing] our country back;" (iv) was recorded on video marching to the Capitol shouting "that's our building, we own it, I think we're going to go take it back today," along with video recordings about storming the building and various other statements demonstrating an intent to engage in an insurrection such as calls to bring out the traitors (calling for violence on members of Congress); (v) he encouraged and induced his young niece, whom he frequently refers to as "kid" and at one point an "accidental patriot," to commit multiple crimes that day; and (vi) his continued lack of remorse including through his interview with the FBI.  (See Govt. Sentencing Memo, Case No. 1:21-CR-00748-JEB at Doc. 41).  He was sentenced to 45 days' incarceration, 9 months' supervised release, and 80 hours' community service.

In *United States v. Lyon*, 1:21-CR-00161-RBW, the Defendant was (i) involved in the theft of a bottle of bourbon and a coat rack (causing the Government to insist on $2,000 in restitution

as part of the plea); (ii) lied to the FBI on several occasions; (iii) was involved in trashing the office of the Senate parliamentarian; (iv) remained on Capitol grounds for approximately 3 hours; (v) and then lied to the FBI when questioned about it.  (See Govt. Sentencing Memo, Case No. 1:21-CR-001618-RBW at Doc. 116).  He had a higher guidelines calculation than Mr. Harrington (in fact double), at a point level of 8 after acceptance of responsibility. *Id.*  Lyon was sentenced to 40 days' incarceration, 12 months' supervised release $1,000 fine, and $2,000 restitution.

In *United States v. Amsini*, 1:23-CR-00423-CJN, the Defendant (i) participated in the breach of a police line in the Crypt where he shouted "Our House;" (ii) watched and applauded as rioters clashed with police and breached the East Rotunda Doors ("Rotunda Doors"), and shouted "Treason!"; (iii) entered and remained in the Senate Chambers/Senate Gallery, an incredibly sensitive and symbolically significant area of the Capitol Building, just 25 minutes after Senators and the Vice President had to be evacuated from the Chamber; (iv) posted on social media from the Senate Gallery that "The police evacuated senators before we got to the top floor" and he and fellow rioters were trying to subject Senators to "citizen arrest cause the justice courts have failed us"; (v) stole valuable government property, specifically a ILC Dover Scape CBRN30 escape hood, in a bag marked "POLICE," which was a device for rapid deployment by individuals responding to emergency situations.  (See Govt. Sentencing Memo, Case No. 1:23-CR-00423-CJN at Doc. 30).  He was sentenced to 45 days' incarceration, 12 months' supervised release, 60 hours' community service, and $749 in restitution.

In *United States v. Vogel*, 1:21-CR-00289-RDM, the Defendant (i) stole hundreds of dollars of personal protective equipment ("PPE") from at least three different areas in the Capitol including 3M – SCOTT AV3000 gas masks from police, black duffel bags belonging to Capitol police, and ILC Dover CBRN30 Escape Hoods, all worth $797.00; (ii) entered the Senate Gallery;

(iii) filmed and posted a video of rioters in the Crypt; (iv) wore a face mask in part to conceal his identity; and (v) Vogel glorified the rioters for "taking a stand" on social media after the riot. (See Govt. Sentencing Memo, Case No. 1:21-CR-00289-RDM at Doc. 74). He was sentenced to 30 days' incarceration, 24 months' supervised release, and $1,806 in restitution.

In *United States v. Wilson*, 1:21-CR-00046-RDM, the Defendant (i) stole a bag containing escape hoods from the Senate Gallery; (ii) attempted to enter the Senate Floor; (iii) engaged in conduct and interactions with police that the Government described as "aggressive and highly confrontational;" and (iv) participated with two others who assaulted officers. (See Govt. Sentencing Memo, Case No. 1:21-CR-00046-RDM at Doc. 251). He was sentenced to 30 days' incarceration, 12 months' supervised release, and $500 restitution.

In *United States v. Varney*, 1:22-CR-00372-JDB, the Defendant (i) took possession of an American flag and flag pole that her husband stole and assisted him in transporting it to Florida, where she later burned/destroyed that evidence to keep the FBI from obtaining it; (ii) entered the Capitol; and (ii) had a higher sentencing guideline number than Mr. Harrington (he has a 2, she had a 6). (See Govt. Sentencing Memo, Case No. 1:22-CR-00372-JDB at Doc. 17). She was sentenced to 24 days' incarceration, 12 months' supervised release, a $1,000 fine, and $500 in restitution.

In *United States v. Petrosh*, 1:21-CR-00347-TNM, the Defendant (i) stole two microphones from Speaker Pelosi's lectern; (ii) deliberately positioned himself at the front of a standoff between rioters and U.S. Capitol Police ("USCP") officers inside the Crypt; (iii) celebrated as rioters broke through the police line inside the Crypt; (iv) the defendant told one of the vastly outnumbered officers in the Crypt, who was staring down an angry mob of rioters, to "Give us Nancy;" (v) the defendant was at the front of a pack of rioters who pursued law

enforcement down a hallway and into the Hall of Columns; (vi) instead of exiting the building through the Hall of Columns after witnessing the clash between rioters and USCP officers inside the Crypt, the defendant decided to turn back around and rejoin the fray inside the building; (vii) the defendant smoked a cigarette inside the Rotunda, one of the most hallowed rooms inside the Capitol; defendant told the FBI during a post-plea debrief that he believed that members of Congress were "lucky that's all that happened"; and (viii) to this day, the defendant does not regret storming the U.S. Capitol on January 6, 2021.  (See Govt. Sentencing Memo, Case No. 1:21-CR-00347-TNM at Doc. 40).  He was sentenced to 10 days' incarceration, 12 months' supervised release, a $1,000 fine, and $938 in restitution.

Finally, in *United States v. Mamone,* 1:21-CR-00289-RDM, the Defendant (i) stole hundreds of dollars of personal protective equipment ("PPE") from at least three different areas in the Capitol including 3M – SCOTT AV3000 gas masks from police, black duffel bags belonging to Capitol police, and ILC Dover CBRN30 Escape Hoods, all worth $797.00; (ii) entered the Senate Gallery; (iii) filmed and posted a video of rioters in the Crypt; (iv) wore a face mask in part to conceal her identity; and (v) posted on social media that she was proud of what she did after the riot.  (See Govt. Sentencing Memo, Case No. 1:21-CR-00289-RDM at Doc. 74).  She was sentenced to 24 months' supervised release including 120 days of home detention, and $1,806 restitution.

Mr. Harrington did not purloin law enforcement equipment, such as helmets or escape hoods, which, we submit, is far more egregious, particularly given the events of January 6.  And thus, we submit, his conduct is less egregious than those of the Defendants in *Amsini*, *Varney*, and *Mamone*.  Mr. Harrington did not brag to national or international media about his actions, nor did he utilize stolen items to celebrate the actions of January 6, as the Defendants in *Riddle*, *Suleski*,

and *Merry* did.  Mr. Harrington did not lie to the FBI, as the Defendants in *Suleski* and *Lyon*.  Nor was he involved in the ransacking of offices as the Defendant in *Riddle* was.

Mr. Harrington was not involved in coercing others to violence nor in participating with in concert with persons who assaulted law enforcement or otherwise engaged in aggressive confrontations with law enforcement, as was the case in several matters above.  And, unlike other Defendants, Mr. Harrington took items of nominal value, versus items of hundreds of dollars in value.

Mr. Harrington's conduct is plainly less culpable than those of the Defendants above, and in most cases significantly less culpable.

Also informing the analysis is that the Defendant here is convicted of two misdemeanors, and engaged in far less culpable misconduct than the Defendants in *U.S. v. Cortez*, 1:21-CR-0317-TSC, who was convicted of a felony and sentenced to 4 months incarceration, 36 months supervised release, $2000 restitution, and 60 hours of community service; and far less culpable misconduct than the Defendant in *U.S. v. Grayson*, 1:21-CR-0224, who was convicted of a felony and sentenced to 60 days incarceration, 36 months supervised release, and $2000 restitution.

Mr. Harrington's misconduct appears to be roughly on par (though in some cases the following Defendants engaged in more egregious misconduct; in some cases slightly less) with the Defendants in: (i) *U.S. v. Keniley*, 1:24-CR-0001-TSC (10 days incarceration, 12 months probation, $500 restitution); (ii) *U.S. v. Bissey*, 1:21-CR-0165-TSC (14 days incarceration, 60 hours community service, $500 restitution); (iii) U.S. v. Stephanie Miller, 1:21-CR-0266-TSC (14 days incarceration, 60 hours community service, $500 restitution); (iv) *U.S. v. Bishai*, 1:21-CR-0282-TSC (14 days incarceration, 12 month's probation, 60 hours community service); (v) *U.S. v. Lattanzi*, 1:22-CR-0028-TSC (14 days incarceration, $500 fine, $500 restitution); (vi) *U.S. v.*

*McCormick*, 1:21-CR-0710-TSC (14 days incarceration, $1000 fine, $500 restitution); (vii) *U.S. v. Moat*, 1:21-CR-375-TSC (10 days incarceration, $500 restitution); (ix) *U.S. v. Uberto*, 1:21-CR-0007-TSC (10 days incarceration, $500 restitution); (ix) *U.S. v. Izari*, 1:21-CR-0282-TSC (14 days incarceration, $500 restitution); (x) *U.S. v. Stephens*, 1:23-CR-0314-TSC (14 days incarceration, $500 fine, $500 restitution); (xi) *U.S. v. Nealy*, 1:23-CR-0278-TSC (14 days incarceration, $500 restitution); (xii) *U.S. v. Nhi Ngoc*, 1:23-CR-0317-TSC (10 days incarceration, $1,000 fine, $500 restitution).

The Government argues that *U.S. v. Spencer*, 1:21-CR-147-CK, is an appropriate comparator, because Spencer was inside the Speaker's offices when staffers were hiding.  Virginia Spencer, however not only entered the Speaker's offices, but also: (1) joined in a group that got into a verbal and physical altercation with a man on the way to the riot only stopping after the MPD officers physically separated them; (2) brought her 14-year-old child into the Capitol during the riot; (4) joined the crowd that surged past police officers trying to hold back the rioters in the Crypt; (6) joined another crowd that formed outside the House of Representatives Chamber that attempted to enter that Chamber while lawmakers were still trapped inside; (7) witnessed violence against law enforcement officers yet continued to participate in the riot; (8) smoked a cigarette in the Capitol; and (9) had other criminal history.  (See Govt. Sentencing Memo, 1:21-CR-147-CK at Doc. 55).  Judge Kollar-Kotelly sentenced the defendant to 3 months of incarceration.  But plainly, Mr. Harrington did not join any groups that got into physical altercations, brought no children into the Capitol, did not participate in a surge or push past police in the Crypt or place officers in danger by doing so, did not join another crowd that tried to enter the House floor, did not witness violence by law enforcement officers, did not smoke a cigarette in the Capitol, and did not have the criminal history that Ms. Spencer did.

The Government also argues that *U.S. v. Jancart*, 1:21-cr-148-JEB and *U.S. v. Rau*, 1:21-cr-467-JEB are also comparators.  Judge Boasberg sentenced each of the defendants to 45 days of incarceration.  Jancart: (1) prepared for violence by bringing a gas mask and two-way radios to Washington, D.C.; (2) was aware of the potential for violence because he responded to the Capitol only after hearing it had been "breached"; (3) he laughed and cheered while the forward line of the rioters broke through the police line and posted a video to Facebook of co-Defendant Rau screaming "we have you surrounded" at the police officers attempting to hold the line around the Capitol; (4) he penetrated the U.S. Capitol all the way to the Speaker's conference room; (5) his statements on Facebook after January 6 reveal a total lack of remorse; (6) he actively spread propaganda on social media by falsely downplaying the violence on January 6; and (8) his social media statements reveal he believes a revolution is coming and suggest the possibility of future violence by this defendant.  (Sentencing Memo, 1:21-cr-00148 at Doc. 25).  Jancart was sentenced to 45 days incarceration.

Rau, meanwhile, (1) was found on video screaming, "we have the police surrounded!" and "we have you surrounded!" while other rioters stormed the stairs of the Capitol. In the background of the video, other rioters can be heard screaming, "traitors gonna hang!" When the rioters broke through the police line, Rau can be heard screaming his encouragement and celebration, "Go, Go, Go!" and "Yeah! They just pushed through the guards!" (2) Rau was prepared for violence when he traveled to Washington, D.C. including bringing a Kevlar lined gloves, wore tactical pants, and carried a medical kit; (3) When Jancart and Rau descended on the Capitol, they knew that it would be violent. They traveled to the U.S. Capitol Building from their hotel room only after learning that the Capitol had been "breached;" (4) Rau admitted to having destroyed evidence by deleting photos and text messages from his cell phone after the riot; (5) Rau had troubling criminal history

including a 2019 domestic violence offense that he was still on probation for on January 6, 2021. (Sentencing Memo, 1:21-cr-00467 at Doc. 13).  Rau was sentenced to 45 days incarceration.

Mr. Harrington's facts and conduct are far less egregious than that of Rau or Jancart.

In recognition that this sentencing Court has imposed incarceration in every January 6 case, and in light of the fact that both the sentencing guidelines Zero Point offender guidance, and the probation office urge the Court to not impose incarceration, Mr. Harrington suggests that an appropriate sentence in this case is 10 days of incarceration, a fine of $500, restitution of $500 to the architect of the Capitol as the parties agreed to, restitution of $10 to Congress for the value of the items in question, one year of probation, and a $35 special assessment.

### C. The Government's Sentencing Memorandum and Sentencing Recommendation is Not in Conformity with the Statutory Sentencing Factors.

A cursory review of the Government's Sentencing Memorandum and Sentencing Recommendation (Doc. 22) reveals that it is not in conformity with the statutory sentencing factors. In a blatant failure to evaluate the § 3553 factors, the Government devotes a mere two paragraphs of its 25-page sentencing memorandum to Mr. Harrington's "history and characteristics."   Clearly, Mr. Harrington, as a person, matters very little to the Government and, in the mind of the Government, he is just another insurrectionist.

While the Government has a compelling obligation to prosecute those involved in the events of January 6, 2021, in doing so, it cannot lose its perspective and forget its obligations to be just, fair, and consistent during the process. In its sentencing memorandum, the Government makes no mention, let alone, acknowledgement that Mr. Harrington:

- • Did not punch or kick a law enforcement officer, have a weapon in his possession, or attempt to use any object as a weapon;
- • has minimal criminal history;
- • is not involved in any groups that planned the attack on the Capitol;

- made no statements about insurrection or that glorified the events of January 6 like many Defendants;
- self-surrendered in Kentucky after being notified of the warrant;
- has been 100% compliant with his supervision requirements for the last year;
- has not been involved in any drugs or contacts with the criminal justice system since his arrest in this case; and
- has maintained employment.

Apparently to the Government, none of this matters. Rather, Mr. Harrington automatically deserves a mid-point guideline range.

**D.  Sentencing Request and Recommendation.**

A term of supervision is determined by reviewing many of the same § 3553(a) factors already considered above, including, as are relevant here: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for deterrence, to protect the public, and provide treatment to the defendant; (iii) the available sentences and sentencing range; (iv) relevant policy statements by the Sentencing Commission; and (v) the need to avoid sentencing disparities. *See* 18 U.S.C. § 3583(c).

Accounting for these factors, and in recognition that this sentencing Court has imposed incarceration in every January 6 case, and in light of the fact that both the sentencing guidelines zero point offender guidance, and the probation office urge the Court to not impose incarceration, Mr. Harrington suggests that an appropriate sentence in this case is 10 days of incarceration, a fine of $500, restitution of $500 to the architect of the Capitol as the parties agreed to, restitution of $10 to Congress for the value of the items in question, one year of probation, and a $35 special assessment.

The conditions of probation will significantly restrict Mr. Harrington's liberty and provide a daily reminder of his criminal conduct by requiring that he, among other things:

- regularly report to his probation officer;
- seek permission from the Court or his probation officer to leave Kentucky;

• respond truthfully to questioning by his probation officer;
• live in an approved residence and notify his probation officer of any address change;
• allow his probation officer access to his residence;
• work fulltime and notify his probation officer of any job change;
• refrain from knowingly communicating with criminals;
• notify his probation officer if he is arrested;
• refrain from possessing a firearm or other dangerous weapons; and
• refrain from possessing illegal drugs or alcohol.

III.    **CONCLUSION**

For the foregoing reasons and others that may appear to the Court or may develop at the

sentencing hearing, Mr. Harrington suggests that an appropriate sentence in this case is 10 days

of incarceration, a fine of $500, restitution of $500 to the architect of the Capitol as the parties

agreed to, restitution of $10 to Congress for the value of the items in question, one year of

probation, and a $35 special assessment.

Respectfully Submitted,

/s/Christopher Wiest_____
Christopher Wiest (DCD KY 0002)
Chris Wiest, Attorney at Law, PLLC
50 E. Rivercenter Blvd, Ste. 1280
Covington, KY 41011
513-257-1895 (v)
859-495-0803 (f)
chris@cwiestlaw.com
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the foregoing upon all Counsel of record, via
CM/ECF, this 13 day of August, 2024.

/s/Christopher Wiest_____
Christopher Wiest (DCD KY 0002)